**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **RADIO SYSTEMS CORPORATION,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**THE UNITED STATES OF AMERICA;**<br>**U.S. CUSTOMS AND BORDER**<br>**PROTECTION; and RODNEY S. SCOTT,**<br>**in his official capacity as Commissioner of**<br>**U.S. Customs and Border Protection,**<br><br>    **Defendants.** | **Case No.** 25-cv-00349 |

## COMPLAINT

1.    Since taking office, President Trump has imposed tariffs on imports from nearly all countries under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* (1977) ("IEEPA"). The IEEPA tariffs have vastly varied in rate, scope, and applicability since first imposed. Notwithstanding, for the greater part of 2025, goods entering the United States from anywhere in the world have been subject to IEEPA duties of at least 10 percent and as high as 145 percent.

2.    In April 2025, a group of importers and States challenged whether IEEPA empowers the President to impose these tariffs. This Court eventually found that it does not. On May 28, 2025, this Court specifically declared that four Executive Orders that imposed IEEPA tariffs on Mexico, Canada, China, and practically the rest of the world were unconstitutional. This Court then permanently enjoined the collection of tariffs under those Executive Orders.

3.    The government appealed this decision to the United States Court of Appeals for the Federal Circuit ("CAFC"). The CAFC stayed enforcement of the injunction while considering the appeal. Then, on August 29, 2025, the CAFC affirmed this Court's ruling that the Executive

Orders "exceeded the authority delegated to the President by IEEPA's text" and "that the orders are 'invalid as contrary to law.'"

4.    The government appealed this decision to the Supreme Court of the United States.

5.    The government continues to collect these unlawful tariffs while the case is on appeal.

6.    This action is necessary to ensure Plaintiff obtains its own judicial relief. If the Supreme Court finds the IEEPA duties unlawful, it is not otherwise guaranteed a refund for those unlawfully collected tariffs.

7.    This action is also necessary because the entries under which Plaintiff paid IEEPA tariffs are at risk of liquidating and becoming final. This could happen at any time and will begin as a matter of law on February 3, 2026. Plaintiff seeks relief from the impending final liquidations to ensure that its right to a complete refund is not jeopardized.[1]

8.    Accordingly, Plaintiff brings this action to recover all tariffs that the United States has unlawfully collected under IEEPA.

**PARTIES**

9.    Plaintiff, Radio Systems Corporation, is a Delaware Corporation. Radio Systems Corporation is the nation's largest supplier of technology-based pet products. Plaintiff has paid tariffs illegally exacted under IEEPA.

10.    Defendant the United States of America collected the illegally exacted duties and is a statutory defendant under 5 U.S. Code § 702 and 28 U.S.C. § 1581(i).

---

[1] Plaintiff, after seeking the Defendants' consent pursuant to Rule 7(f) of this Court, will be filing a motion for a preliminary injunction to suspend liquidation of all entries under which the Defendants purport to impose duties under IEEPA.

11. Defendant United States Customs and Border Protection ("CBP") is a component agency of the United States Department of Homeland Security headquartered in Washington, D.C. CBP is responsible for border security and collecting tariffs on imported goods.

12. Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

## JURISDICTION AND VENUE

13. This Court has exclusive subject-matter jurisdiction over this Action under 28 U.S.C. §§ 1581(i)(1)(A)-(C) because it is brought against the United States and "arises out of a[] law of the United States providing for . . . embargoes or other quantitative restrictions of the importation of merchandise for reasons other than the protection of the public health or safety," "arises out of a[] law of the United States" that has been improperly invoked to "provid[e] for . . . tariffs [and] duties . . . for reasons other than the raising of revenue," and also "arises out of a[] law of the United States providing for revenue from imports." *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1365-67 (Ct. Int'l Trade 2025) (cleaned up); *see also V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (affirming the United States Court of International Trade's subject matter jurisdiction over matters related to the validity of the IEEPA tariffs).

## FACTUAL AND LEGAL BACKGROUND

### President Enacts Tariffs under the International Emergency Economic Powers Act

14. On February 1, 2025, President Trump issued three Executive Orders under IEEPA that imposed tariffs on goods from Canada, Mexico and China (the "trafficking tariffs"). Executive Order 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025); Executive Order 14194, *Imposing Duties to Address the*

*Situation at Our Southern Border*, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ("Mexico Tariff Order"); Executive Order 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025). The trafficking tariffs were imposed to address public health threats caused by the trafficking of illicit drugs like fentanyl from Canada, Mexico, and China. *Id.*

15.     Following February 1, 2025, the trafficking tariffs were substantially amended in rate, scope, and applicability. *See* Executive Order 14198*, Progress on the Situation at Our Southern Border,* 90 Fed. Reg. 9185, 9185 (Feb. 3, 2025)*;* Executive Order 14197*, Progress on the Situation at Our Northern Border,* 90 Fed. Reg. 9183, 9183 (Feb. 3, 2025); Executive Order 14226, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11369, 11369 (Mar. 2, 2025); Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277, 9277 (Feb. 5, 2025); Executive Order 14227, *Amendment to Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 11371, 11371 (Mar. 2, 2025); Executive Order 14231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11785, 11785 (Mar. 6, 2025); Executive Order 14232, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11787, 11787 (Mar. 6, 2025);  Executive Order 14256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14899, 14899 (Apr. 2, 2025); Executive Order 14325, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 37957, 37957 (Jul. 31, 2025).

16.     Following the amendments, the trafficking tariff rates for goods from Mexico and Canada that do not meet the country of origin requirements of the United States-Mexico-Canada

Agreement are 25 and 35 percent, respectively. The rate for Chinese goods is 10 percent. *See* Executive Order 14357, *Modifying Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 50725, 50725 (Nov. 4, 2025).

17.     On April 2, 2025, President Trump imposed additional tariffs under IEEPA – styled as reciprocal tariffs – on "'all imports from all trading partners,' which 'shall increase for' a list of 57 countries to higher rates ranging from 11 percent to as high as 50 percent ad valorem." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025). Shortly thereafter, the reciprocal tariffs were paused for all countries besides China for 90 days. *See* Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025).

18.     For all countries but China, the reciprocal tariff rate on practically all goods would be 10 percent. For China, the reciprocal tariff rate was increased from 34 to 84 percent, Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025), and then from 84 to 125 percent, effective April 10, 2025, Executive Order 14266, 90 Fed. Reg. at 15626. China's reciprocal tariff rate was later lowered to 10 percent. Executive Order 14298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21831, 21831 (May 12, 2025).

19.     This Court's opinion and judgment found that the Executive Orders issued up to and including May 12, 2025, were unconstitutional. *V.O.S. Selections, Inc.*, 772 F. Supp. 3d 1350. Plaintiff will refer to these Orders that purport to enact tariffs pursuant to IEEPA as the "Challenged Executive Orders."

20.    President Trump has issued several trade and tariff related Executive Orders under

IEEPA since May 12, 2025, such as:

a.    Executive Order 14316, *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30823, 30823 (Jul. 7, 2025) (extending temporary suspension of certain reciprocal tariff rates to continue trade negotiations with certain countries);

b.    Executive Order 14323, *Addressing Threats to the United States by the Government of Brazil*, 90 Fed. Reg. 37739, 37739 (Jul. 30, 2025) (imposing 40 percent tariffs in response to alleged censorship and human rights violations by the Brazilian government);

c.    Executive Order 14324, *Suspending Duty-Free De Minimis Treatment for All Countries*, 90 Fed. Reg. 37775, 37775 (Jul. 30, 2025) (eliminating *de minimis* duty exemptions to address alleged national security and trade enforcement concerns);

d.    Executive Order 14325, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 37957, 37957 (Jul. 31, 2025) (increasing trafficking tariff on Canadian goods to 35 percent due to alleged inadequate cooperation on drug enforcement);

e.    Executive Order 14326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37963, 37963 (Jul. 31, 2025) (adjusting tariff rates based on trade agreement negotiations with trading partners);

f.    Executive Order 14329, *Addressing Threats to the United States by the Government of the Russian Federation*, 90 Fed. Reg. 38701, 38701 (Aug.

6, 2025) (imposing 25 percent tariff on Indian imports due to India's trade in Russian oil);

g.  Executive Order 14334, *Further Modifying Reciprocal Tariff Rates To Reflect Ongoing Discussions With the People's Republic of China*, 90 Fed. Reg. 39305, 39305 (Aug. 11, 2025) (extending reciprocal tariff suspension on Chinese goods amid ongoing trade negotiations);

h.  Executive Order 14345, *Implementing the United States-Japan Agreement*, 90 Fed. Reg 43535, 43535 (Sep. 4, 2025) (modifying scope of IEEPA and Section 232 tariffs to reflect trade agreement reached with Japan);

i.  Executive Order 14346, *Modifying the Scope of Reciprocal Tariffs and Establishing Procedures for Implementing Trade and Security Agreements*, 90 Fed. Reg. 43737, 43737 (Sep. 5, 2025) (modifying prior tariff exclusions under Executive Order 14257 and establishing procedures for implementing trade and security agreements);

j.  Executive Order 14357, *Modifying Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 50725, 50725 (Nov. 4, 2025) (lowering the Chinese trafficking tariff from 20 percent to 10 percent);

k.  Executive Order 14358, *Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China*, 90 Fed. Reg. 50729, 50729 (Nov. 4, 2025) (extending the period during which the reciprocal tariff on Chinese goods is 10 percent as opposed to 34 percent);

l.      Executive Order 14360, *Modifying the Scope of the Reciprocal Tariffs With Respect to Certain Agricultural Products*, 90 Fed. Reg. 54091, 54091 (Nov. 14, 2025) (implementing exceptions to the reciprocal tariffs for certain agricultural products); and

m.     Executive Order 14361, *Modifying the Scope of Tariffs on the Government of Brazil*, 90 Fed. Reg. 54467, 54467 (Nov. 20, 2025) (implementing exceptions to the Brazil IEEPA tariff for certain agricultural products).

21.     Plaintiff will refer to the Executive Orders issued after May 12, 2025, as the "Subsequent Executive Orders."

**Reciprocal Tariffs' In-Transit Exception Is Substantially Different From Prior Actions**

22.     The Executive Orders implementing the trafficking tariffs included in-transit provisions which allowed for certain goods entering the United States to be exempt from the related tariffs. Executive Order 14195, 90 Fed. Reg. at 9122 ("Except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty"); *see also* Executive Order 14194, 90 Fed. Reg. at 9118 (including identical language); Executive Order 14193, 90 Fed. Reg. at 9114 (including identical language).

23.     Merchandise could qualify for these exceptions in two ways. Before 12:01 a.m. eastern time on February 1, 2025, the merchandise had to be either "loaded onto a vessel at the port of loading ***or*** in transit on the final mode of transport prior to entry into the United States." *Id.* (emphasis added).

8

24.     These conditions provided importers with reasonable flexibility in a world where multi-modal shipping is standard in international supply chains.

25.     These conditions were also parallel with in-transit exceptions for previously enacted duties on goods imported into the United States.

26.     For example, the Office of Foreign Assets Control enacted in-transit exceptions related to a General License related to sanctions on Russia. *See Publication of Russian Harmful Foreign Activities Sanctions Regulations Web General License 83A*, 89 Fed Reg 20119, 20119 (Mar. 21, 2024) ("loaded onto a vessel at the port of loading"); *accord Publication of Russian Harmful Foreign Activities Sanctions Regulations Determination and Web General Licenses 55, 56, and 57*, 89 Fed. Reg. 76931, 76931 (Dec. 16, 2022). Under these in-transit exceptions, the goods qualified if they were "loaded onto a vessel at the port of loading" before the cut-off date. *Id.*

27.     The United States Trade Representative did the same, conditioning an in-transit exception to tariffs on certain Chinese goods under Section 301 of the Trade Act of 1974 on when the goods were exported from China. *See Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 21892, 21892 (May 15, 2019) ("To distinguish between covered products of China subject to the 10 percent rate of additional duty from those subject to the 25 percent rate, the Annex to this notice creates a new heading in Chapter 99 of the HTSUS (9903.88.09) for products of China covered by the September 2018 action that were exported before May 10, 2019, and entered into the United States on or after May 10, 2019 and before June 1, 2019"); *accord Additional Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed Reg. 26930, 26930

(Jun. 10, 2019); *accord Notice of Technical Amendment to Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 86 Fed. Reg. 22092, 22092 (Apr. 26, 2021).

28.    Accordingly, before April 2025, agencies across the government provided importers with reasonable expectations regarding structure and conditions to qualify for international trade related in-transit exceptions.

29.    Because of this, importers were not surprised that the Executive Order implementing the reciprocal tariffs also included an in-transit exception. Executive Order 14257, 90 Fed. Reg. at 15045.

30.    However, in enacting the reciprocal tariffs, the President abruptly altered the government's longstanding approach to in-transit exceptions by changing the qualification requirements for this new in-transit exception.

31.    Specifically, the qualification requirements for the in-transit exception for the reciprocal tariffs – and all IEEPA tariffs issued thereafter – are as follows: "except that goods loaded onto a vessel at the port of loading ***and*** in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 5, 2025, and entered for consumption or withdrawn from warehouse for consumption after 12:01 a.m. eastern daylight time on April 5, 2025, shall not be subject to such additional duty." Executive Order 14257, 90 Fed. Reg. at 15045 (emphasis added).

32.    Without any prior notice, importers relying on the in-transit exception framework historically used by the government and mirrored in the trafficking tariff Executive Orders were suddenly expected to comply with restrictive and never-before-seen requirements to qualify for the in-transit exception.

33.     This substantial change to the in-transit exception was not immediately highlighted on CBP's Frequently Asked Questions (FAQs) page.

34.     Importantly, importers with goods loaded onto vessels before April 5, 2025, would have been compliant with the in-transit exception were it not altered from the structure and conditions that government agencies previously implemented.

35.     Upon making this unannounced change, importers were suddenly expected to ensure that the vessel upon which merchandise was loaded was also the final mode of transit before entry into the United States.

36.     These expectations are unrealistic when considering the practical nature of ocean freight. Once merchandise is loaded onto a vessel and the vessel embarks toward its destination port, redirecting the merchandise is often not feasible if not impossible. The new in-transit exception framework somehow expected importers to address this challenge without adequate notice.

37.     Many importers, including Plaintiff, were shocked to learn that the in-transit framework was amended. These amendments were buried in both the Executive Order and in guidance issued by U.S. Customs and Border Protection ("CBP") shortly after the reciprocal tariffs were announced. *See* CSMS # 64649265 - GUIDANCE – Reciprocal Tariffs, April 5, 2025 Effective Date; *see also* CSMS # 64680374 - GUIDANCE – Reciprocal Tariffs, April 5 and April 9, 2025, Effective Dates. The President nor CBP provided reasonable notice to importers.

38.     Later on, unsurprisingly, CBP had to clarify the qualification requirements for importers. Long after importers could possibly have altered their shipments to qualify for the in-transit exception, CBP added relevant language to its International Emergency Economic Powers Act (IEEPA) Frequently Asked Questions web page. U.S. CUSTOMS AND BORDER PROTECTION,

https://www.cbp.gov/trade/programs-administration/trade-remedies/IEEPA-FAQ (last updated Apr. 30, 2025).

39.     Now under the FAQ entitled "What is the applicability of in transit provisions for reciprocal duties under IEEPA?" CBP lays out how merchandise was able to qualify for the in-transit exception.

40.     This supplemental information was plainly insufficient to allow importers to accommodate for the in-transit exception to the reciprocal tariffs. Importantly, this information was also not available to importers before April 4, 2025, meaning they would have had no reasonable means to feasibly alter their shipping plans. U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/trade/programs-administration/trade-remedies/IEEPA-FAQ (last updated Mar. 31, 2025).[2]

41.     Importers who met the requirements of the in-transit exception of the trafficking tariffs, i.e., importers with merchandise loaded onto a vessel *or* the merchandise in transit on the final mode of transit before the relevant cut-off dates, should be exempt from paying the reciprocal tariffs on qualifying merchandise.

**Radio Systems Corporation Pays Tariffs**

42.     Plaintiff is in the pet products business. Plaintiff is the largest supplier of technology-based pet products in the United States

43.     In the ordinary course of that business, Plaintiff imports merchandise into the customs territory of the United States.

---

[2] According to a virtual snapshot of CBP's IEEPA FAQ page website, there was no guidance regarding the newly structured in-transit exception as of April 4, 2025. *See* **Exhibit 1**.

44.     When importing goods, Radio Systems utilizes a multi-modal shipping strategy, which is common in the industry. For example, Radio Systems uses varying combinations of vessel, rail, air, and ground shipping.  Companies book their shipping routes weeks in advance of shipping and making changes to shipping routes is difficult if not impossible depending on the location of various vessels in the shipping process.

45.     To continue operating, Plaintiff imported merchandise on, around, and following the date that the United States imposed tariffs under IEEPA, pursuant to both the Challenged Executive Orders and the Subsequent Executive Orders.

46.     In compliance with the then effective laws, Plaintiff paid all applicable tariffs exacted by the United States – including the tariffs imposed under IEEPA, pursuant to both the Challenged Executive Orders and the Subsequent Executive Orders.

### This Court Holds the Duties Unconstitutional

47.     On May 28, 2025, this Court issued an opinion holding the IEEPA tariffs imposed under the Challenged Executive Orders unconstitutional. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

48.     Separately, this Court "ORDERED that Executive Order 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14195*, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90

Fed. Reg. 15041 (Apr. 2, 2025) . . .; and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law." *Id.*, Dkt. No. 56.

49.    In line with this Order, this Court permanently enjoined the collection of duties pursuant to any of those orders.

50.    The United States promptly appealed to the CAFC and sought a stay of enforcement of this Court's injunction.

### The Court of Appeals for the Federal Circuit Upholds this Court's Ruling

51.    The CAFC stayed enforcement of this Court's injunction pending the appeal on June 10, 2025. *V.O.S. Selections, Inc.,* 149 F.4th 1312, Dkt. No. BL-51. As a result of the stay, the United States continues to collect tariffs enacted under IEEPA.

52.    Then, on August 29, 2025, the CAFC issued an opinion affirming-in-part, vacating-in-part, and remanding-in-part this Court's Order from May 28, 2025. *V.O.S. Selections, Inc.,* 149 F.4th at 1340. The CAFC specifically affirmed "that the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders exceed the authority delegated to the President by IEEPA's text" and "that the orders are 'invalid as contrary to law.'" *Id.* The CAFC vacated only "the CIT's grant of a permanent injunction universally enjoining the enforcement of the Trafficking and Reciprocal Tariffs" to comply with the Supreme Court's holding in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). *Id.*

53.    Separately, the CAFC issued judgment in line with the foregoing. *Id.*, Dkt. No. BL-160. Therewith, the CAFC issued an Order by which the Clerk of the CAFC was directed to "withhold issuance of the mandate through October 14, 2025, during which the parties may file a petition for a writ of certiorari in the Supreme Court." *Id.,* Dkt. No. BL-161. "If, within that period, any party notifies the Clerk in writing that it has filed a petition for a writ of certiorari, the Clerk

is directed to withhold issuance of the mandate pending (1) the Supreme Court's denial of certiorari or (2) a judgment of the Supreme Court if certiorari is granted." *Id.*

54.    The government filed a petition for a writ of certiorari on September 3, 2025. *Id.,* Dkt. No. BL-163. The Supreme Court granted the petition for a writ of certiorari on September 9, 2025. *Id.* Dkt. No. BL-165. Oral arguments were held on November 5, 2025.

55.    The CAFC's stay remains in effect during the pendency of the government's appeal, so the Defendants continue to collect tariffs that were unlawfully enacted under IEEPA.

### COUNT I
### Repayment of Illegally Exacted Tariffs Under the Challenged Executive Orders

56.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

57.    Since February 4, 2025, Plaintiff has paid IEEPA tariffs attributable to the Challenged Executive Orders.

58.    This Court issued an opinion holding the IEEPA tariffs imposed under the Challenged Executive Orders unconstitutional.

59.    The United States Court of Appeals for the Federal Circuit issued an opinion affirming "that the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders exceed the authority delegated to the President by IEEPA's text" and "the orders are 'invalid as contrary to law.'"

60.    Because the tariffs were not authorized by federal law, the amounts paid pursuant to them were illegally exacted and a money judgment in that amount should issue against the United States.

**COUNT II**
**The Subsequent Executive Orders are Ultra Vires and Violate the Separation of Powers**

61.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

62.     The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises…." Art. I, § 8, cl. 1.

63.     No statute authorizes the President to issue the Subsequent Executive Orders. The only statute conveying substantive authority to the President cited in the Subsequent Executive Orders is IEEPA. But IEEPA does not authorize the imposition of such tariffs, if it authorizes tariffs at all.

64.     Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is unconstitutional and ultra vires.

65.     The Subsequent Executive Orders are not authorized by IEEPA or any other statute. As such, they are ultra vires and unlawful.

66.     Because the President lacks statutory authority to impose the tariffs in the Subsequent Executive Orders, the Subsequent Executive Orders are an exercise of Congressional authority in violation of separation of powers.

67.     The IEEPA tariffs imposed under the Subsequent Executive Orders are similar in basis, degree, and nature to the Challenged Executive Orders.

68.     This Court issued an opinion holding the IEEPA tariffs imposed under the Challenged Executive Orders unconstitutional.

69.     The United States Court of Appeals for the Federal Circuit issued an opinion affirming "that the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders

exceed the authority delegated to the President by IEEPA's text" and "the orders are 'invalid as contrary to law.'"

70.    Because these tariffs were not authorized by law, the Court should declare that the Subsequent Executive Orders are ultra vires and contrary to law.

**COUNT III**
**Repayment of Illegally Exacted Tariffs Under the Subsequent Executive Orders**

71.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

72.    Since May 12, 2025, Plaintiff has paid IEEPA tariffs attributable to the Subsequent Executive Orders.

73.    The IEEPA tariffs imposed under the Subsequent Executive Orders are similar in basis, degree, and nature to the Challenged Executive Orders.

74.    This Court issued an opinion holding the IEEPA tariffs imposed under the Challenged Executive Orders unconstitutional.

75.    The United States Court of Appeals for the Federal Circuit issued an opinion affirming "that the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders exceed the authority delegated to the President by IEEPA's text" and "the orders are 'invalid as contrary to law.'"

76.    Because the IEEPA tariffs imposed under the Subsequent Executive Orders were similarly not authorized by federal law, the amounts paid pursuant to them were illegally exacted and a money judgment in that amount should issue against the United States.

**COUNT IV**
**Repayment of Illegally Exacted Tariffs Under the In-Transit Exception to the Reciprocal Tariffs**
**(Fifth Amendment Procedural Due Process)**

77.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

78.    The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

79.    "An essential principle of due process is that a deprivation of . . . property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

80.    The lawful notice and opportunity for hearing that must be afforded before property rights may be deprived depend on the balance of "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

81.    Plaintiff had a property interest in the money used to pay the tariffs illegally exacted by the United States under the in-transit exception to the reciprocal tariffs.

82.    The United States deprived the Plaintiff of said property interest by illegally imposing the in-transit exception to the reciprocal tariffs and requiring that Plaintiff pay said tariffs or else be subject to certain penalties.

83.     Radio Systems was not given any notice or an opportunity to be heard regarding application of the new in-transit exception implemented with the reciprocal tariffs. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 542; *see also* Exhibit 1.

84.     Radio Systems should have been given notice and an opportunity to be heard regarding application of the revised in-transit exception because 1) the funds expended are essential to maintain reliable operations, 2) there was an extremely high risk of erroneous deprivation of its property rights due to the unexpected action that could have been remedied by additional safeguards, and 3) there would not have been a substantial government burden to implement notice and hearings related to implementation of the in-transit exception. *Matthews*, 424 U.S. at 335.

85.     Importantly, the United States changed how it historically had implemented in-transit exceptions with the new language implemented for the reciprocal tariffs.

86.     Therefore, the United States was required to provide the Plaintiff with notice and an opportunity to be heard before depriving the Plaintiff of its protected interest.

87.     As a direct and proximate result of United States' actions, Plaintiff suffered harm, including loss of property and financial loss.

88.     In the event that the Supreme Court rules in favor of the government, this Court should grant Plaintiff relief for duties unlawfully collected during the in transit exception period.

**COUNT IV**
**Repayment of Illegally Exacted Tariffs Under the In-Transit Exception to the Reciprocal Tariffs**
**(Fifth Amendment – Equal Protection)**

89.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

90.    The due process guarantee of the Fifth Amendment to the United States Constitution includes a guarantee of equal protection. U.S. Const. amend. V; *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). This prohibits the federal government, its agencies, its officials, and its employees from denying persons equal protection of the laws. *Id.*

91.    To justify discriminatory conduct, the government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (citing, *e.g., U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973)). "[A] bare desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *City of Cleburne*, 473 U.S. at 447.

92.    The United States deprived Plaintiff of equal protection under the laws of the United States by unlawfully enacting and enforcing the in-transit exception to the reciprocal tariffs.

93.    The United States unlawfully discriminated between importers who shipped goods by vessel directly to the United States and those who engaged in multi-modal shipment. As demonstrated by previous implementation of in-transit exceptions, the delineation was arbitrary and unlawfully caused parties engaging in multi-modal shipment to be deprived of equal protection of the law. *City of Cleburne*, 473 U.S. at 446.

94.    The in-transit exception was also arbitrarily and irrationally enacted with a bare desire to harm importers engaging in multi-modal shipment. *Id*. at 447.

95.    The United States' actions ultimately constituted a violation of Plaintiff's guarantee of equal protection under the due process guarantee of the Fifth Amendment to the United States Constitution. U.S. Const. amend. V; *Bolling*, 347 U.S. at 499.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests

a.    That the Court declares that the Subsequent Executive Orders are ultra vires and contrary to law;

b.    That the Court declares that CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Challenged and Subsequent Executive Orders;

c.    That the Court enjoins Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the Challenged and Subsequent Executive Orders;

d.    A money judgment against the United States in favor of Plaintiff in the amount of all tariffs paid by Plaintiff pursuant to the illegal Challenged Executive Orders and Subsequent Executive Orders;

e.    That the Court declares that the issuance of the in-transit exception to the reciprocal tariffs was unlawful and in violation of the Fifth Amendment due process clause and sets it aside;

f.    That the Court declares that the issuance of the in-transit exception to the reciprocal tariffs was unlawful and in violation of the equal protection guarantee of the Fifth Amendment and sets it aside;

g.    A money judgment against the United States in favor of Plaintiff in the amount of all tariffs paid by Plaintiff as a result of the unlawfully imposed in-transit exception;

h.    Interest available by statute or rule;

  i.  An award of reasonable attorney fees and costs to Plaintiff pursuant to 28

     U.S.C. § 2412 or any other applicable authority; and

  j.  All other relief this Court deems just and proper.


Date: December 4, 2025       Respectfully submitted,

                      _____

                      P. Lee Smith
                      Matthew W. McGee
                      BAKER, DONELSON, BEARMAN,
                       CALDWELL & BERKOWITZ, PC
                      901 K Street, N.W. Suite 900
                      Washington, D.C. 20001
                      leesmith@bakerdonelson.com
                      mmcgee@bakerdonelson.com
                      202-326-5026

                      *Attorneys for Radio Systems Corporation*

# EXHIBIT 1

The Wayback Machine - https://web.archive.org/web/20250404231209/https://www.cbp.gov/trade/programs-administration/trade-re…

 U.S. Customs and Border Protection

# International Emergency Economic Powers Act (IEEPA) Frequently Asked Questions

## Overarching

 ⤢ Close all   ⤢ Open all

### What are informational materials described in 9903.01.22, 9903.01.12, and 9903.01.03?   —

Headings 9903.01.22, 9903.01.12, and 9903.01.03 describe informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact discs, CD ROMs, artworks, and news wire feeds.

Goods properly classified under the following headings and subheadings of the HTSUS may qualify for the exception under 9903.01.22, 9903.01.12, and 9903.01.03:  Chapter 49; goods provided for in headings 3704, 3705, 3706, 5807, 8310, and 9701 through 9705, inclusive; goods provided for in subheadings 6307.90.30, 6307.90.85, 8523.80.10, 8523.29, 8523.41, 8523.49, 9405.61, and 9405.69.

### What date do I use to determine the tariffs that are due on my entry?   —

The determining date is the date the goods are entered for consumption or withdrawn from warehouse for consumption. For further information, please refer to the regulations on Time of Entry in 19 CFR 141.68. Further information is available in the Duty Rate Date Matrix Hierarchy documented in the ACE CATAIR Entry Summary Create/Update:

The date is chosen from those reported (or those determined by CBP), in the following order:

When Entry Type **06** (FTZ) **_and_** the merchandise has be claimed as **P** (Privileged Foreign Status):

- 41-Record **Privileged FTZ Merchandise Filing Date** (if accepted without condition)

When a 'quota' Entry Type (i.e., **02** (Consumption - Quota/Visa), **07** (Consumption - AD/CVD + Quota/Visa), **12** (Informal - Quota/Visa), **32** (Warehouse Withdrawal - Quota), or **38** (Warehouse Withdrawal - Quota & AD/CVD),

- **Entry Date** (as determined by CBP)
- 11-Record **Estimated Entry Date** (if accepted without condition)
- **Release Date** (as determined by CBP)
- **Preliminary Statement Print Date** (if accepted without condition)
- 20-Record **Estimated Date of Arrival** (if accepted without condition, ONLY if later than **EDI Received Date**)
- **EDI Received Date** (i.e., the "system date"; when no other date available)

Otherwise,

- 20-Record **In-Bond/In-Transit Date** (if accepted without condition)
- **Entry Date** (as determined by CBP)
- 11-Record **Estimated Entry Date** (if accepted without condition)
- **Release Date** (as determined by CBP)

12/2/25, 12:58 PM

Case 1:25-cv-00349-JB    Document 16    Filed 11/04/25    Page 26 of 31
International Emergency Economic Powers Act (IEEPA) Frequently Asked Questions | U.S. Customs and Border Protection

- **Preliminary Statement Print Date** (if accepted without condition)
- 20-Record **Estimated Date of Arrival** (if accepted without condition, ONLY if later than **EDI Received Date**)
- **EDI Received Date** (i.e., the "system date"; when no other date available)

## Can shipments of products be entered under informal entry procedures if such products are valued in excess of $250.00?     —

Informal entry is not permitted and formal entry is required for any merchandise that exceeds $250 in value and is classified in Subchapters III and IV of Chapter 99 of the HTSUS.

## When do the additional tariffs apply if I am filing entry using Immediate Delivery (ID)?     —

Pursuant to 19 CFR 141.68, the time of entry under ID will be the time the entry summary is filed in proper form. The entry summary must be filed within 10 working days after release. Please see CSMS # 63419911 - Immediate Delivery - End of Year Authorization 2024 for more details.

## When do the additional tariffs apply if I am filing a warehouse entry?     —

Duties are due on the date of the withdrawal from warehouse for consumption (entry type 31/32/34/38). Please see eCFR :: 19 CFR Part 144 -- Warehouse and Rewarehouse Entries and Withdrawals and eCFR :: 19 CFR Part 141.68 -- Time of entry for more information.

Case 1:25-cv-00349-JEB Document 61-2 Filed 12/04/25 Page 27 of 31

### Does the ad valorem duty apply to merchandise admitted into an FTZ in privileged foreign status prior to IEEPA tariff implementation, upon withdrawal as entry type 06 consumption entry? —

Such articles will be subject, upon entry for consumption, to the duties imposed by the Executive Order and the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admission into the United States foreign trade zone.

### If goods are entered under a Temporary Importation under Bond (TIB), are they subject to the additional duties? —

The additional ad valorem duty is assessed on consumption entries. TIB importations are not consumption entries, and therefore the additional ad valorem duty will not be assessed on goods that qualify for TIB entry. The bond for TIB entries, with limited exceptions, shall be in an amount equal to two times the estimated duties, including fees, determined at the time of entry per 19 C.F.R. § 10.31(f).

### For immediate transportation (IT) shipments where the IT date is prior to IEEPA tariff implementation date but the arrival date is after the IEEPA tariff implementation date, are goods subject to the additional ad valorem duties? —

Merchandise entered for immediate transportation shall be subject to the duty rates in effect when the immediate transportation entry was accepted at the port of original importation, subject to the requirements specified in 19 CFR 141.69(b):

Merchandise which is not subject to a quantitative or tariff-rate quota and which is covered by an entry for immediate transportation made at the port of original importation, if entered for consumption at the port designated by the

consignee or his agent in such transportation entry without having been taken into custody by the port director for general order under section 490, Tariff Act of 1930, as amended (19 U.S.C. 1490), shall be subject to the rates in effect when the immediate transportation entry was accepted at the port of original importation.

If merchandise is entered for immediate transportation in accordance with 19 CFR 141.69(b) prior to IEEPA tariff implementation date, then it is not subject to the additional ad valorem duty.

## Is guidance available on the applicability of the additional ad valorem duty to goods classifiable under chapter 98, HTSUS?   —

The additional duties shall **not apply** to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of CBP, and whenever CBP agrees that entry under such a provision is appropriate, **except for** goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60.  For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed, as described in the applicable subheading.  For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad, less the cost or value of such products of the United States, as described.

Goods that are classifiable under other headings or subheadings of Chapter 98 are not subject to the additional duties, on the condition that such a heading or subheading is properly claimed in compliance with applicable regulations, and that CBP agrees with the claimed classification.

## Will there be tariffs on additional countries or products?   —

CBP cannot speak to future actions regarding tariffs.

To ensure you see all the up-to-date information it is recommended that you follow the White House Presidential Actions webpage and the *Federal Register*, published daily. Make sure you are registered for CBP's Cargo Systems

International Emergency Economic Powers Act (IEEPA) Frequently Asked Questions | U.S. Customs and Border Protection

[Messaging Service](#) to register to receive CSMS messages via email regarding news, updates, and technical information on ACE.

# Canada and Mexico

## Can I get the 25 percent tariff on USMCA goods refunded for entry dates March 4, 2025 to March 6, 2025? —

Effective on or after March 7, 2025, goods entered for consumption or withdrawn from warehouse for consumption from Canada or Mexico that qualify for the USMCA preference are not subject to the additional tariffs under the IEEPA. The rules that govern whether a product qualifies for USMCA preference are found in General Note 11 of the Harmonized Tariff Schedule of the United States (HTSUS). However, goods entered for consumption or withdrawn from warehouse for consumption from Canada or Mexico between March 4, 2025 and March 6, 2025 are subject to the additional tariffs under IEEPA. CBP is not able to refund the additional duties under the IEEPA paid during that timeframe inasmuch as the tariffs were in effect during that time.

## How do I determine the country of origin for my goods from Canada or Mexico? —

Please see [eCFR :: 19 CFR Part 102 -- Rules of Origin](#) for determination of country of origin marking. When determining the country of origin for purposes of applying the additional duties under the IEEPA, the substantial transformation analysis would be applicable.

## My goods were in transit before the tariff was announced. Do the tariffs apply to my goods? —

12/2/25, 12:58 PM    International Emergency Economic Powers Act (IEEPA) Frequently Asked Questions | U.S. Customs and Border Protection

Case 1:25-cv-00349-JLR    Document 61    Filed 12/04/25    Page 30 of 31

There was an in-transit exclusion for products of China that was detailed under HTS 9903.01.23. This exclusion expired on March 7, 2025. There is no in-transit exclusion for Canada or Mexico.

# China and Hong Kong

## My goods are subject to an exclusion from Section 301 duties. Will they be subject to the additional duty on products of China imposed pursuant to IEEPA? —

The additional ad valorem duty provided for in HTSUS heading 9903.01.20 or 9903.01.24 applies in addition to all other applicable duties (including Section 301 duties), taxes, fees, exactions, and charges. Even if goods are subject to an exclusion from Section 301 duties, if they are classified in HTSUS heading 9903.01.20 or 9903.01.24, they are subject to the additional ad valorem duty provided for in HTSUS heading 9903.01.20 or 9903.01.24.

## For heading 9903.01.23 - Prior to February 1, do the goods have to be loaded onto a vessel at the port of loading, in transit on the final mode of transport prior to entry into the US, or loaded onto a vessel destined to the US in a transshipment country? —

To be described by heading 9903.01.23, the goods have to be loaded onto a vessel at the port of loading in China or Hong Kong before February 1, or in transit on the final mode of transport prior to entry into the United States before February 1, and must meet the remaining conditions described in that heading, including the condition that the goods must be entered for consumption, or withdrawn from warehouse for consumption, prior to March 7, 2025.

Case 1:25-cv-00349-JLP   Document 11   Filed 12/04/25   Page 31 of 31

**What is the guidance for shipments where the HTSUS numbers were transmitted in a sequence on the entry summary line that is different from the sequencing guidance that was posted in CSMS # 64018403?** —

Please review CSMS# 64018403 for the updated entry summary order of reporting. Please contact your Client Representative if you continue to experience errors with the entry summary.

**Last Modified: Mar 31, 2025**